IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 2, 2021

## IN RE KYLER C. ET AL.[1]

**Appeal from the Juvenile Court for Grundy County**
**No. 6590      William Riley Anderson, III, Judge**

_____

**No. M2020-01366-COA-R3-PT**

_____

In this second appeal of the termination of a mother's and father's rights to their children, we consider the best interest of four children.  In the previous appeal, we affirmed that clear and convincing proof established the existence of severe abuse and therefore constituted a ground for termination. On remand, the trial court made appropriate findings and determined that it was in the children's best interest for the rights of the mother and father to be terminated.  On appeal, we conclude that the evidence establishes that termination is in the children's best interest. Accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Matthew Sewell Bailey, Spencer, Tennessee, for the appellant, Amanda C.L.

Sarah Bible Willis, Jasper, Tennessee, for the appellant, Nikolas V.L.

Alice W. Wyatt, Dunlap, Tennessee, for the appellees, Linda S.T. and Ricky S.T.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

This termination of parental rights case comes before us a second time and involves four young children: Kyler, born in 2010, Ella, born in 2012, Charlie, born in 2015, and Nikolas, born in 2017. Their mother is Amanda C.L. ("Mother"). Nikolas V. L. ("Father") is the father of three of the children: Ella, Charlie, and Nikolas. Kyler's biological father's

---

[1] This Court has a policy of protecting the identity of children by initializing the last names of the parties.

rights were also terminated by the juvenile court, but he has not appealed that ruling, and so the termination of his rights is not at issue in this appeal.

In the fall of 2016, the Department of Children's Services ("DCS") removed Kyler, Ella, and Charlie due to the parents' drug use and neglect.[2] Their former neighbors, Mr. Ricky S.T. and Mrs. Linda S.T. ("Guardians"), intervened in the dependency and neglect proceedings, and the trial court awarded custody of the three children to the Guardians in October 2016. At the time, Mother was pregnant with another child, Nikolas, and she and Father were abusing methamphetamines. When she gave birth prematurely to Nikolas in January 2017, he tested positive for drugs and experienced withdrawal symptoms. After a stay in the neonatal intensive care unit, he too was placed with the Guardians. He was adjudicated dependent and neglected, and the juvenile court found that he had been severely abused by Mother and Father due to his in-utero drug exposure. Mother and Father did not appeal that ruling. In July 2017, the Guardians filed a petition to terminate Mother's and Father's parental rights on the grounds of the parents' severe abuse and persistence of conditions. Mother and Father were appointed counsel, and a trial was held a year later. The juvenile court terminated both parents' rights to the children based on the prior order's finding that the parents had committed severe abuse and upon its conclusion that termination was in the children's best interest. Mother and Father appealed.

Our opinion in the previous appeal concluded that, based on the juvenile court's finding in the adjudicatory hearing order that Mother and Father were perpetrators of severe child abuse as defined in Tenn. Code Ann. § 37-1-102, a finding that Mother and Father did not appeal, clear and convincing evidence supported the juvenile court's finding that there was a ground for terminating Mother's and Father's parental rights. *In re Kyler C.*, 2020 WL 1951690, at *4. Thus, a ground was established for terminating Mother's and Father's parental rights to all four children, and we affirmed the trial court's holding in that regard. *Id*. However, because the trial court's order of termination did not make any findings of fact to support its conclusions regarding the best interest of each child or offer any indication that the statutory best interest factors were considered, other than citing the subsection of the statute that lists the factors for consideration, we concluded that we were unable to review the court's best interest determination. *Id.* at *5. We vacated the termination and remanded the matter for the trial court to make "specific findings of fact and conclusions of law as to each child as required by Tennessee Code Annotated § 36-1-113(k)." *Id.*

---

[2] In the dependency and neglect petition, DCS alleged that Kyler, Ella, and Charlie were "spending the night in a home that was [e]nvironmentally unsafe due to filth, garbage, dog feces, a large amount of fleas, no safe food, no beds to sleep on and exposed hazards of broken furniture and sharp objects." *In re Kyler C.*, No. M2019-00041-COA-R3-PT, 2020 WL 1951690, at *1 (Tenn. Ct. App. Apr. 23, 2020) (footnote omitted).

On remand, the trial court entered a new order which made findings pertinent to several of the statutory factors and determined that termination was in the children's best interest. Mother and Father have each appealed the trial court's decision.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-

02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

## ANALYSIS

Because we have affirmed the trial court's conclusion that the parents' severe abuse constituted a ground to terminate their parental rights as to all four children, *In re Kyler C.*, 2020 WL 1951690, at *4; *see also* Tenn. Code Ann. § 36-1-113(g)(4), we proceed to considering the court's best interest determination. With respect to the best interest determination, a trial court must consider the nine factors enumerated in Tenn. Code Ann. § 36-1-113(i).[3] A court must view the child's best interest from the perspective of the child, not that of the parent. *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is obligated to consider "all the factors and all the proof," *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The first two statutory factors look at the parents' current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be

---

[3] Tennessee Code Annotated section 36-1-113(i) was amended, effective April 22, 2021, to expand the list of factors for the court's consideration. *See* 2021 Tenn. Pub. Acts Ch. 190 § 1, eff. April 22, 2021. However, the law to be applied is that which was in effect when the petition was filed on July 26, 2017, and neither party asserts otherwise. Accordingly, we will consider the evidence in light of the prior nine best interest factors, as did the trial court.

in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the parents' potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). The record shows that the parents were no strangers to DCS's involvement, as 19 previous cases had been opened involving this family due to various allegations of Mother's and Father's neglect and abuse. In this particular case, DCS was relieved of its obligation to provide services to this family after the parents were found to have committed severe abuse, and thus factor two is not especially relevant. Considering the changes made by the parents, the trial court found:

> [A]lthough the parents have made adjustments in their lives, they have not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in the home of the parents, in that, at the time of the hearing based on the testimony in open court, the parents are not completely ready to have the children placed back in the home; and that their past drug use continues to affect their ability to function and their ability to remember; and that the mother does not have employment; and that the mother does not have a valid driver's license; and that the parents do not have adequate transportation[.]

The evidence in the record before us does not preponderate against the juvenile court's findings of fact.[4] From our review of the record, the evidence showed that the parents began using drugs in 2013 after a series of tragedies: they lost an infant son to hydrocephaly and heart defects; Mother's father died; the home they shared with Mother's mother burned rendering them homeless and largely without possessions; Father's parents both passed away within a few months of each other; and Father was diagnosed with testicular cancer. Father testified that his drug usage really accelerated after the children were removed, at which point he began to use drugs every day.

However, after Nikolas was born and placed in the Guardians' custody in January 2017, both parents enrolled in drug rehab at Buffalo Valley in the spring of 2017, which

---

[4] Relevant to the trial court's findings that "their past drug use continues to affect their ability to function and their ability to remember," Mother and Father argue that having two children currently in the home shows that "[t]heir past drug use has not affected their memory so bad[ly] that they cannot parent their other children." While the testimony does establish that, since the children's removal, Mother was able to regain custody of her teenage son Hunter, that their son Lucas was born without drugs in his system, and that Mother and Father are able to keep a three-bedroom home clean and tidy, it also shows that Mother's memory was shaky in several regards. She had trouble recalling specifics about when she began to use drugs, how often she did them, when she found out she was pregnant with Nikolas, how much she paid in rent at the house next door to the Guardians', how many days Nikolas was alive before the no contact order was entered, and her children's health situations prior to their removal. Father's memory was also unclear on several dates and events. Thus, the evidence does not preponderate against the trial court's findings in that regard.

they completed. At the time of trial in the summer of 2018, both parents testified that they were still drug-free. Father testified that he has been working steadily since December 2017, that he is required to take random drug screens as part of his job; that he has never refused to take a drug test, and that if he fails a drug screen, he will lose his job. He testified that he has not failed a drug screen since he went to rehab. Mother testified that rehab gave her tools she could use to help her stay sober and that Buffalo Valley "helped [her] set up with the mental health co-op in Chattanooga," which helped her with her medication. To address her mental health issues, Mother sees counselors there once a month and a doctor every two months.

Mother testified that she "feel[s] confident in sobriety, but [she] do[es] know that things can happen." She said that she and Father "have people that [they] can turn to" who have been sober for many years and can help them, as well as the family therapy they were beginning with her teenage son, Hunter. As far as support systems to help the parents continue their sober lifestyle, Father testified that his boss is a recovering addict who is 20 years sober. Mother testified that she has "a friend that's got 15 years sobriety" as well as a neighbor with 30 years of sober living. Neither Father nor Mother provided the names of these individuals, specified how they would provide support other than "knowing … what we may be feeling," or called any of them to testify on their behalf. Mother testified that Hunter would also be able to help, since "Hunter will not hesitate to let everyone know if we are not doing well." She also testified that her mother could be of assistance, but the proof at trial established that Mother's mother was unaware that Mother and Father were abusing drugs when they had lived with her, and while Mother's mother may now know the signs of drug abuse, she herself is in poor health, on oxygen, requires a wheelchair, and relies on the services of a live-in caregiver. As Mother testified, her mother has "been pretty sick the last few years." Thus, her ability to support Mother and Father is questionable.

Both parents offered rather vague testimony about their attendance at Narcotics Anonymous ("NA") meetings. Mother testified that they attend "probably . . . twice a month." Both parents testified about Narcotics Anonymous meetings being held "down the road" from their house, but neither provided specifics about the support group, introduced attendance records, or called a sponsor to testify on their behalf. Mother admitted that, if the children were returned, she would need to look into attending NA meetings where children are welcomed, and that such meetings existed in Chattanooga though she did not currently know where they were located.

Mother and Father have certainly adjusted their circumstances: the testimony showed that, at the time of trial, they were both sober for more than a year. The parents' sobriety — a significant and laudable change — does not automatically mean that it is now in the children's best interest to be returned to their home, however. Factor one also requires that we consider the physical condition of their home, which also necessitated the children's removal in the first place.

In the time since the children were removed, Mother and Father have secured a three-bedroom home. The testimony and video proof submitted at trial showed that the environmental neglect that Kyler, Ella, and Charlie suffered was not present in their current home. Hunter testified that the house is clean and there is no drug use in the home. Mother testified that these children "deserve to know that we want them enough to — to get our life together."

Mother acknowledged that having four additional children in the home would be an adjustment but testified that "it's going to be a welcome difference," since the change from "having little feet running all over the house to silence [when they were removed]" was "unreal." She testified that she "believe[d] without a shadow of doubt in [her] mind that [they] will be able to pick up and maintain . . . financial stability and everything" if the children were returned. However, the evidence in the record shows that the parents would struggle to financially support four additional children should they be returned. Since getting out of rehab in the spring of 2017, Father had three jobs in a span of one year. At his current job, Father testified that he works 40-50 hours a week on Mondays through Thursdays and can work overtime. Father testified that he makes approximately $670 per week and would need help, in the form of Mother getting a job, in order to feed four additional children. He stated that he is currently able to support himself, Mother, Hunter, and the new baby, but he also testified that the family is on food stamps.

Mother and Father both testified that Mother was considering getting a job at a nearby Dollar General that would pay $10 per hour, but Mother testified that the Dollar General store was currently on a hiring freeze that would be lifted "within the next couple of weeks." No application or written job offer from Dollar General was offered into evidence. Moreover, other obstacles to safely and effectively parenting an additional four children include the fact that Mother does not have a valid driver's license, as she still owes approximately $1600 in "tickets that [she] need[ed] to pay off . . . [in order to] get [her] license back." Father testified that he had about that much money in a safe in their home, but that he was planning to put the money toward the purchase of a bigger vehicle as the family's five-person sedan cannot accommodate four additional children. Thus, as of the time of the hearing, transportation was still an obstacle the parents would need to overcome. While Mother stated that there was a bus stop and access to public transportation less than a mile from her home, she admitted she "d[id]n't know how that works" if she were to try to use it with her children.

Moreover, Mother's and Father's current home in which they live has three bedrooms. A video entered into evidence at trial illustrated that it was orderly and clean but that it was not ready to accommodate four additional children, as the parents and the baby, Lucas, occupied one bedroom, Hunter occupied a bedroom, and the other bedroom contained a set of unassembled twin bunk beds and a third mattress for Kyler and the girls.[5]

_____
[5] At the time of trial, Mother's mother was also living with the family in a bed they had set up in the

Mother testified that Nikolas could sleep in the parents' room in a toddler bed. The video of their home illustrates that no toddler bed had yet been procured. Mother and Father provided no evidence that they had acquired bedding, clothing, or toys that would make the house suitable for the four children at issue.

In summary, Mother and Father had been sober for a little over a year without the assistance of DCS and had established a home that appeared neat and clean, though the addition of four children would certainly strain the home's space and the family's finances. On balance, the evidence relative to factors one and two does not weigh in favor of termination.

The next two statutory factors focus on the parents' relationship with the children. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Regarding these factors, the trial court found:

> The Court finds that the parents failed to establish or maintain a meaningful relationship with the children, in that, because of the parents' actions, their visitation was suspended; and prior to the suspension of visitation the parents were under the influence of methamphetamine and were unable to maintain any significant meaningful relationship with the children for the majority of their lives and for the entire life of the youngest child, Nikolas[.]

The evidence supports this finding. Initially, the parents exercised visitation weekly, but that was suspended after Nikolas was born with drugs in his system. No consistent visitation has occurred since that time. While there is evidence that Mother attempted to contact the court and her former counsel to reestablish visitation with her children after completing rehab, there is no evidence that the three older children experienced a warm and nurturing relationship with Mother or Father, either prior to their removal or afterward during their weekly hour-long visits. Mother testified that she was sometimes under the influence of drugs when she was around her children prior to their removal. No witness provided testimony that the children asked about Mother and Father or expressed a desire to see them after visitation was suspended. Nikolas has known no home but the Guardians', and since Mother and Father have never had visitation rights with him, no relationship exists. Both the third and fourth factors weigh in favor of termination.

The fifth factor looks at the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). Pertinent to these factors, the trial court found:

---

dining room, along with her live-in caregiver, who slept on the couch. However, Mother testified on the last day of trial that her mother would be moving out in a matter of days.

The Court finds that the effect of a change of caretakers and physical environment to that of the parents after the children have been in the home of the Petitioners for almost two years for the three older children and all of the youngest child's life at the time of the hearing would likely be severely traumatic to the children's emotional, physical, and possibly medical condition based on the medical proof and testimony presented in court as to the children's condition at the time of removal from the parents; the undisputed proof is that the children are healthy, adjusted and thriving in their current placement with the Petitioners[.]

The record supports these findings. The children are in a safe, stable, and loving home where their needs are being met. All four children are now receiving the medical care they need but did not receive while in the care and custody of Mother and Father. The children are in school or daycare and have a schedule and routine to which they are accustomed. Charlie and Nikolas were enrolled in a daycare where they were "doing well" and "very loved." At the time of trial, they were at home for the summer with Ms. T, who is a school teacher herself. The children's medical and dental needs are being met, as they are all up to date on their immunizations. Now that Kyler and Ella's severe dental needs have been met, they are eating well, and with no pain, in the case of Kyler.

Rick B., the Guardians' Sunday School teacher, testified that he had been around the children both at church and in the Guardians' home and observed the children to be "very, very happy." Larry M., who oversaw the property next door to the Guardians, in which Mother, Father, and the children lived for two months, and now lives in it himself, testified that he sees the children as "happy little kids," and "kids with smiles." In addition to being active at their church, the Guardians have been camping with the children several times, have taken them to the aquarium and the fair, and allow the children to participate in sports, though for a short time, Kyler's participation had to be curtailed on his eye doctor's recommendation. The Guardians' adult children and extended family are also close to the children, who have enjoyed spending "many weekends picnicking and cooking out" with Mr. T's sister's family, including their adult daughter with special needs and five-year-old son, with whom the children are "very close." In sum, Kyler, Ella, Charlie, and Nikolas are currently thriving. Mother herself recognized that her children are well cared for and loved by the Guardians. She testified that removing them from their current home without phasing them into hers gradually would be traumatic for the children. Factor five weighs heavily in favor of termination.

The sixth factor asks the court to determine whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there

is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner[.]"). Pertinent to these factors, the trial court found:

> The Court finds that prior to the removal, the parents' neglect of the children was so severe that the children had to live in unsanitary and unsafe conditions with inadequate clothing and shoes; the children's medical neglect was so severe that their immunizations were over a year behind; and that Kyler []'s teeth were so decayed that eating was painful; and that Kyler []'s eye condition was so advanced that the mother told DCS she thought he was blind; however, medical treatment was never sought; and that Charlie [] suffered from the same eye condition with no medical treatment; and that Ella [] suffered from severely decayed teeth with no dental treatment[.]

The evidence does not preponderate against the above findings. When the children were the Guardians' next door neighbors, the Guardians provided clothing, food, baths, and school supplies prior the children's removal because the parents failed to do so. The parents also consciously ignored their children's dental and vision problems.

Kyler had significant dental and vision issues when he came into the Guardians' home, which have been addressed by the Guardians. The record shows that Kyler, then 5 years old, required surgery under general anesthesia in order to address his dental problems that occurred as a result of the neglect he suffered at the hands of Mother. When he came into the Guardian's custody in October 2016, Kyler was "eating poorly and having trouble chewing meats and things." Mrs. T. described his teeth as "broken and black in many places," and "he was in pain." Mrs. T took all three children to the dentist shortly after they came to their home, and surgery took place within two to three weeks. Kyler had to have 11 decaying teeth removed and the rest capped. Kyler was "not doing well" in school when he first came into the custody of the Guardians, in part due to a lack of attendance, but also because he could not see well. After his vision issues were addressed and the Guardians "starting working on things at home" with him, "there was no discernable difference between him and other kindergartners." Mrs. T. noticed that he had some speech issues, so she also made it a point to have him evaluated when he was in first grade so he could begin receiving speech therapy services.

In November 2016, Mrs. T. addressed Kyler and Charlie's vision issues by taking them to the eye doctor, who referred them to a specialist. She testified that Kyler was diagnosed with amblyopia, or lazy eye, "where the eye just sits in the corners or edges of the eye" and also esotropia, where "instead of the eye moving straight from side to side, it tilts." Initially, his eye doctor tried to fix the problem with glasses, but surgery was ultimately required in order to realign his eyes. Kyler still wears glasses.

When Ella came into the Guardians' home, she was 4 years old and had emotional issues: she rocked, had nightmares, and would hoard food. All have abated while living

with the Guardians; Ella "sleeps peacefully and stays in her own bed at night." Mrs. T. reported that Ella would also engage in "very forceful rocking" in order to self-soothe when angry or if "things weren't rosy" but also when just sitting on the couch watching television. The Guardians addressed this issue with Ella's pediatrician, and now, Ella sees a therapist to help her learn to manage her feelings. As a result, "[t]he rocking is better," according to Mrs. T. The emotional needs of Ella are being met. Ella also had significant dental issues at the time she came to the Guardians' home as a result of the neglect she faced in the home of Mother and Father; she also required surgery under general anesthesia in order to remove five teeth and have the rest capped to protect them.

Charlie had the same obvious eye condition as Kyler, which Guardians promptly addressed. Mrs. T. testified that Charlie's eye condition "was so severe that it didn't move at all," causing her doctor to be "concerned that the brain would stop picking up signals from the eye." To treat it, Guardians were instructed to place an eye patch over Charlie's strong eye to "force the brain to make connections with the weak eye," which they did "for several months" before surgery was performed. Photos entered at trial reflect that now her eyes look and function normally.

Nikolas was born drug-exposed and suffered withdrawal symptoms, necessitating a stay in the neonatal intensive care unit. While there, he contracted a rhinovirus and also suffered a breathing incident that prolonged his stay. Mrs. T. was with him daily while he was in the hospital, and upon his discharge, she woke up during the night to feed him because he "was a poor feeder" and "had to be fed every three hours around the clock." As he has grown, he has been diagnosed with congenital atrial septal defect that will likely necessitate open heart surgery to repair.

Further, there is no dispute that Mother and Father abused drugs, and that Mother's use of methamphetamine while pregnant with Nikolas resulted in his removal and the severe abuse finding. Kyler and Charlie both had vision issues that Mother claims to have noticed but left unaddressed. Additionally, in the past, Hunter reported to DCS that he was physically and mentally abused by his Mother and also mentally abused by Father (his step-father) due to Hunter's sexual orientation. The sixth factor weighs in favor of termination.

As to the seventh factor, *id.* § 36-1-113(i)(7), the parents' neglect and lack of safe, clean, and stable housing necessitated the children's removal, and while the house Mother and Father currently reside in is a marked improvement from the homelessness and chaos they were experiencing at the time of the children's removal, it would be incredibly cramped if these four children were returned. As for Mother's ability to be a safe and stable caregiver, there was no testimony about activities the children could participate in at the home, other than watching Mother cook meals, feed and play with the newest baby, or watching Father play video games. Mother's time is currently completely absorbed with caring for her newest baby, and it's clear that adding four children to the household would

- 11 -

be a strain on Mother's and Father's resources of time and energy and on the family's financial resources. On balance, the seventh factor weighs neither in favor of nor against termination.

The eighth statutory factor evaluates the parents' mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The trial court made no findings pertinent to this factor. Mother testified about her various mental health issues, specifically that she has been diagnosed as having "some PTSD after losing the baby [in 2013]," bipolar, and clinically depressed. She is on medications, including a mood stabilizer and an antidepressant, and believes she has these issues under control "at this point" and agreed that staying on medication was important. She testified that she takes several medications to manage her mental health and goes to counseling at the mental health co-op. While she was able to safely care for a new baby and a teenaged son in her home, she testified that she is aware of the reality that adding four additional young children to the home would be a significant adjustment. The parties presented no testimony relative to Father's mental health. Factor eight does not weigh in favor of termination.

The ninth factor looks at the parents' child support history. *See id.* § 36-1-113(i)(9). With respect to this factor, the court found "that the parents failed to pay child support consistent with the child support guidelines." There is no dispute that the parents have made no child support payments for these children since their removal. Mother and Father attempted to establish that they permitted the Guardians to claim the children on their 2016 tax returns in lieu of paying support, but absolutely no child support payments were provided at any point in 2017 or 2018. There was also no testimony illustrating that Mother and Father provided any in-kind support or birthday or holiday gifts or cards at any point, especially prior to the entry of the no contact order in January 2017 after Nikolas's birth. Factor nine weighs in favor of termination.

Though not an enumerated factor, the parents also urged the trial court and this court to consider the relationship the children have with their grandmother and other siblings who are not at issue in this proceeding. Mrs. T testified that, prior to the no contact order being entered, she took the children to the three family functions to which Mother and Father invited them and that there were no other requests to see the children. She also took them on at least three separate occasions to visit Mother's mother. Mrs. T. noted that the children were "always happy to see [Mother's mother], but they never made a request to go." With respect to Hunter, Mrs. T. testified that he had the Guardians' phone numbers and could communicate with her on Facebook and that they gave him "carte blanche" so that "he could see the children anytime that he wanted" but that he "just doesn't come." We do not discern the presence of a significantly close relationship between Mother's mother and the children or between the children and their siblings who are not at issue in this appeal such that it weighs heavily against termination. Moreover, we note that

termination of the parents' rights does not amount to termination of the grandmother or siblings' ability to maintain a relationship with these children. The Guardians testified to their ongoing commitment to allow the children to maintain those relationships, should an interest be expressed.

In conclusion, Kyler, Ella, Charlie, and Nikolas are thriving in a safe and stable home provided for them by a family that loves them and wishes to adopt them. The children's medical, emotional, physical, and educational needs, which had been ignored by Mother and Father while the children were in their care, are being met. With respect to Nikolas, he has known no other home or caregivers but the Guardians' since coming home from the hospital after his premature birth, so a change in caregivers would be especially traumatic to him. As to Kyler, Ella, and Charlie, any remaining bond between Mother and Father and these children is outweighed by the nurturing, safe, and stable relationships they have developed with the Guardians. Changing their caretakers and physical environment would also be traumatic. The evidence does not preponderate against the trial court's factual findings, and we conclude that the combined weight of the facts present in the record before us amounts to clear and convincing evidence that termination of Mother's and Father's parental rights is in the best interest of the children. The termination of Mother's rights to all four children and Father's rights to Ella, Charlie, and Nikolas is affirmed.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellants, Amanda C.L. and Nikolas V.L., for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE

- 13 -